IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

CHARLES E. MATTISON, JR.,

   *Plaintiff*,

v().

MARYLAND TRANSIT
ADMINISTRATION, MARYLAND
DEPARTMENT OF TRANSPORTATION,

   *Defendant*

No. 24-cv-3338-ABA

**MEMORANDUM OPINION**

Plaintiff Charles Mattison contends that his employer, the Maryland Transit Administration ("MTA"), subjected him to a hostile work environment and retaliated against him based on protected activities and alleged disabilities of diverticulitis and alcohol dependency, and failed to provide accommodations in violation of section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (count one), the Maryland Fair Employment Practices Act ("MFEPA"), Md. Code Ann., State Gov't. § 20-601, *et seq.* (count three)[1], and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.* (count four). The MTA has moved to dismiss all three counts. For the reasons provided below, the Court will grant the motion to dismiss. Mr. Mattison's Rehabilitation Act claims will be dismissed with prejudice (they cannot be reasserted in this case); the other claims will be dismissed without prejudice.

---

[1] The second amended complaint does not contain a count two. In count three, Mr. Mattison refers to the MFEPA by its prior name, the Maryland Human Relations Act.

## BACKGROUND

Mr. Mattison began working for the MTA on May 20, 2011, and is currently a Repairman/Mechanic Class A. ECF No. 23 ¶¶ 13–14. He has filed and settled two previous employment-related lawsuits with the MTA. *Id.* ¶¶ 19–20, 66, 76. He filed the first case in 2015 and alleged violations of the FMLA, the Americans with Disabilities Act, the Rehabilitation Act, and the MFEPA. *Id.* ¶ 19. That case was settled in 2017. *Id.* ¶ 20. The second case, which asserted similar claims, was filed in 2020 and settled on February 15, 2022. *Id.* ¶¶ 66, 76; ECF No. 27-2.

Since the second settlement, Mr. Mattison alleges that the MTA has been "attempting to fabricate reasons to terminate him," but has not yet terminated him. ECF No. 23 ¶ 84. The following are the allegations supporting the claims in his second amended complaint that occurred after the second settlement.

Mr. Mattison claims that on April 18, 2023, he "was written up and threatened with an occurrence because he did not respond to pages when he was in the bathroom" due to his alleged disability, *id.* ¶ 105; *see also id.* ¶ 87, and, on the same day, "was questioned and interrogated" by Assistant Administrator Dorothy Peoples "on how he had replaced a part on a bus needing repair with a part that purportedly was not in stock." *Id.* ¶ 88. Mr. Mattison alleges that he informed Ms. Peoples "that the inventory records are not accurate and have not been since he had started at the MTA." *Id.* He further alleges that Ms. Peoples "continued harassing [him] by continuing to interrogate [him] even [though] he had provided her with a truthful explanation." *Id.*

Mr. Mattison alleges that on April 24, 2023, he "was called to Dorothy Peoples' office because he did not immediately respond to being paged because he was having a flareup and was in the bathroom." *Id.* ¶ 106. He alleges that Ms. Peoples "kept

questioning him as to his whereabouts even after [he] explained that he was in the bathroom in gastrointestinal distress," *id.* ¶ 106, "as if she did not believe him in an attempt to fabricate that he was lying as to his whereabouts in order to get him fired," *id.* ¶ 107.

Mr. Mattison alleges that on April 27, 2023, he "was put in a room with Administrator Rufeshwaer Bhagwandin, Asst. Administrator Dorothy Peoples, Shop Stewart Jimmy Carter, and Plaintiff's supervisor, Brian Brooks" and that "Mr. Brooks sat in a chair blocking the door and preventing Plaintiff from leaving." *Id.* ¶ 89. He alleges that he "was interrogated about not answering a page when he was having a diverticulitis flare-up and was using the bathroom," and that "[d]espite explaining that he was in the bathroom, Bhagwandin and Peoples persisted in interrogating [him] regarding his whereabouts." *Id.* On this same date, Mr. Mattison alleges that "Superintendent Rupeshwar Bhagwandin called [him] into his office and accused him of being on his cell phone on April 25th." *Id.* ¶ 108, *see also id.* ¶ 95. Mr. Mattison "denied that he was on his phone, at which point Mr. Bhagwandin called Supervisor Brian Brooks into his office," who "placed a chair in the doorway, sat in it, and physically blocked Mr. Mattison from leaving." *Id.* ¶ 108, *see also id.* ¶ 95. Mr. Mattison alleges that the men "proceeded to aggressively interrogate" him, *id.* ¶ 108, "in a hostile and threatening manner," *id.* ¶ 95. Mr. Mattison alleges that he "felt harassed, intimidated, and threatened, both verbally and physically." *Id.* ¶ 108; *see also id.* ¶ 96. It is not clear whether these two incidents describe the same meeting or two separate meetings.

Mr. Mattison alleges that also in April, Ms. Peoples told him he was not allowed to pick up a part from a different division. *Id.* ¶¶ 91–92. He alleges that when he "asked why he was the only Repairman not allowed to pick up parts, Peoples refused to give

him a reason and in a hostile and condescending tone told him 'because I said so.'" *Id.* ¶ 92. Similarly, and also in April, Mr. Mattison alleges that when he told Ms. Peoples that "he wanted to pick up a part from another base," she "asked him in an accusatory manner how he was going to pick up a part when the inventory report was zero for that part." *Id.* ¶ 93. Mr. Mattison alleges that he "explained that the inventory reports are consistently inaccurate" and that "the other division [likely] had the part." *Id.* He alleges that Ms. Peoples "refused to let him get the part thereby disrupting his ability to do the necessary repair." *Id.*

Mr. Mattison further alleges that in April 2023, he "was called into the office" because "he had been absent on certain days" and that he "explained that he had been awarded FMLA" leave for that time. *Id.* ¶ 94. He alleges that "Management . . . did not believe him and continued to question, interrogate, and harass him regarding the absences." *Id.*

Mr. Mattison continues that in June 2023, "Kevin Edwards, a then supervisor at the Northwest Division" told him "that he had come to learn that Plaintiff had been put on an MTA 'blacklist,' and that MTA management was trying 'to get rid of him' because of and in response to his prior-filed grievances, EEOC charges, and lawsuits, and the successful settlements he had received." *Id.* ¶¶ 97–98.

Mr. Mattison also alleges that "MTA management . . . began attempting to set [him] up to arrive late to random drug testing appointments in order to get him fired" by "setting appointments and notifying Mattison such that he would only have sometimes 20 to 25 minutes to make the appointment," which was not sufficient time. *Id.* ¶¶ 99–102. He alleges that this occurred on August 18 and 28, 2023, October 23 and 27, 2023, and December 27, 2023. *Id.* ¶ 102. Mr. Mattison alleges that "[d]ue to the

4

patent unfairness and violation of policy in setting shortened arrival times for drug testing and the concomitant anxiety and stress, [he] filed a grievance on August 29, 2024." *Id.* Mr. Mattison alleges that he also filed an EEOC charge on August 30, 2023. *Id.* ¶ 3.

Finally, Mr. Mattison alleges that at some point, the MTA refused to hear another grievance that Ms. Peoples had "inappropriately touch[ed] him" on two occasions "in a manner that made him feel uncomfortable." *Id.* ¶ 110.

Mr. Mattison alleges that he received his right-to-sue letter from the EEOC on June 19, 2024. *Id.* ¶ 6. On September 16, 2024, Mr. Mattison filed a complaint in the Circuit Court for Baltimore City alleging violations of the MFEPA, the Americans with Disabilities Act, the Rehabilitation Act, and the FMLA. ECF No. 4. On November 19, 2024, the MTA removed the case to this Court. ECF No. 1. Mr. Mattison filed amended complaints on January 20, 2025 and February 5, 2025. ECF Nos. 14 & 23. In the operative complaint (the second amended complaint, filed February 5, 2025), Mr. Mattison alleges three counts: count one under the Rehabilitation Act for failure to accommodate, retaliation, and hostile work environment, count three under MFEPA for failure to accommodate, retaliation, and harassment/hostile work environment, and count four under the FMLA for interference and retaliation. ECF No. 23 ¶¶ 112–145. The MTA then filed the present motion to dismiss, to which Mr. Mattison responded and the MTA replied. ECF Nos. 27, 32, 33.

## STANDARD OF REVIEW

The MTA has styled its motion as a motion to dismiss or in the alternative for summary judgment. It is not necessary to treat the motion as one for summary judgment because, as explained below, the Court concludes that even accepting the

5

allegations in the complaint as true, the complaint does not state cognizable claims. The MTA's motion to dismiss is premised on Federal Rule of Civil Procedure 12(b)(1), lack of subject matter jurisdiction, and 12(b)(6), failure to state a claim.

"A motion to dismiss based on lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) raises the question of whether the court has the competence or authority to hear the case." *Davis v. Thompson*, 367 F. Supp. 2d 792, 799 (D. Md. 2005). "The burden of establishing subject matter jurisdiction is on . . . the party asserting jurisdiction." *Robb Evans & Assocs., LLC v. Holibaugh*, 609 F.3d 359, 362 (4th Cir. 2010). "Generally, when a defendant challenges subject matter jurisdiction via a Rule 12(b)(1) motion to dismiss, the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

A complaint must also contain "a short and plain statement of the claim showing the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When a defendant asserts that, even assuming the truth of the alleged facts, the complaint fails "to state a claim upon which relief can be granted," the defendant may move to dismiss the complaint. Fed. R. Civ. P. 12(b)(6). To withstand a motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and state a facially plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering such a motion, the Court "must accept as true all of the factual allegations contained in the complaint

and draw all reasonable inferences in favor of the plaintiff." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016).

## DISCUSSION

### I.  Sovereign Immunity

The MTA contends that sovereign immunity bars Mr. Mattison's Rehabilitation Act and FMLA claims.

As for the FMLA claims, Mr. Mattison "concedes that Defendant did not waive sovereign immunity for a suit for monetary damages under the FMLA" but contends that he "is seeking injunctive relief." ECF No. 32-1 at 15; *see Coleman v. Court of Appeals of Maryland*, 566 U.S. 30, 37–38 (2012) (holding that Congress did not abrogate states' sovereign immunity from suits for money damages under the FMLA's self-care provision). But the second amended complaint states otherwise, contending that "[p]ursuant to the FMLA, Mr. Mattison has the right to bring a civil action for damages and other relief." ECF No. 23 ¶ 141. And while Mr. Mattison includes in his general prayer for relief a request for "injunctive relief barring continued discrimination and granting reasonable accommodation on the job," injunctive relief is not mentioned in connection with his FMLA claim in count four. *Id.* at 27. If Mr. Mattison files a third amended complaint, it must make clear that he is only seeking injunctive relief under the FMLA.

Regarding his Rehabilitation Act claims, Mr. Mattison alleges that the MTA has waived its immunity pursuant to 42 U.S.C. § 2000d-7, which provides that "[a] State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973." 42 U.S.C. § 2000d-7(a)(1).

"[I]n Maryland, the doctrine of sovereign immunity is applicable not only to the State itself, but also to its agencies and instrumentalities," such as the MTA, "unless the General Assembly has waived the immunity either directly or by necessary implication." *Magnetti v. Univ. of Maryland*, 402 Md. 548, 556 (2007) (quoting *State Highway Admin. v. Kim*, 353 Md. 313, 333 (1999)). Pursuant to 42 U.S.C. § 2000d-7, states and their agencies that receive federal funding, like the MTA, have waived their immunity to Rehabilitation Act claims brought "in Federal court." 42 U.S.C. § 2000d-7(a)(1); *see Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 491 (4th Cir. 2005) (holding that pursuant to § 2000d-7, "States are not immune from federal suits to enforce" section 504).

But "a State waives its Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction." *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 101 (4th Cir. 2019) (internal quotation marks omitted) (quoting *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990)). Here, the express language of § 2000d-7 only waives immunity "from suit *in Federal court* for a violation of section 504." 42 U.S.C. § 2000d-7(a)(1) (emphasis added). Mr. Mattison has not cited any provision extending the immunity waiver to section 504 claims brought in state court. Here, Mr. Mattison originally brought this case in state court, and therefore the MTA retains immunity to the Rehabilitation Act claims in that court. The question remains, however: By removing the case to federal court, did the MTA waive its immunity?

Generally, "[i]f Congress did not grant permission to bring [a proceeding] in a state court, the federal court [is] without jurisdiction upon its removal." *Minnesota v.*

8

*United States*, 305 U.S. 382, 389 (1939). This is because "jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction." *Id.* "Where the state court lacks jurisdiction of the subject matter or of the parties, the federal court acquires none," even though in "a like suit originally brought in a federal court it would have had jurisdiction." *Id.*; *see also Biggs v. North Carolina Dep't of Public Safety*, 953 F.3d 236, 241 (4th Cir. 2020) ("In this circuit, a state's removal of a suit to federal court waives sovereign immunity only if the state has consented to suit in its own courts.").

Since *Minnesota*, the Supreme Court has found that in some contexts a state can waive immunity by removing a case from state court to federal court. In *Lapides v. Board of Regents of University Systems of Georgia*, the state of Georgia had waived its immunity to claims under the Georgia Tort Claims Act brought in state court but not to such claims brought in federal court. 535 U.S. 613, 616–17 (2002). After the defendants removed the case from state court to federal court, Georgia argued that it was now immune to the Tort Claims Act claims because it had not waived immunity to them in federal court. *Id.* The Supreme Court, "limit[ing its] answer to the context of state-law claims," *id.* at 617, held that by voluntarily removing the case to federal court, Georgia had waived its Eleventh Amendment immunity. *Id.* at 618–24. The Court so held because holding otherwise could create "seriously unfair results." *Id.* at 619.

But courts, including the Fourth Circuit, have found that *Lapides* is "limited in scope," and was concerned with "consistency, fairness, and preventing States from using [sovereign immunity] 'to achieve unfair tactical advantages.'" *Stewart v. North Carolina*, 393 F.3d 484, 490 (4th Cir. 2005) (quoting *Lapides*, 535 U.S. at 621). In *Stewart*, North Carolina and other state actors removed the case from state court to federal court. 393 F.3d at 487. As in this case, North Carolina was immune to the

9

intentional tort and gross negligence claims in state court but not in federal court. *Id.* The Fourth Circuit framed the issue as "whether a state waives its sovereign immunity by voluntarily removing an action to federal court when it would have been immune from the same action in state court." *Id.* It found that, unlike in *Lapides*, the removal in *Stewart* could not create an unfair result and thus there was no immunity waiver. *Id.* at 490. The Fourth Circuit held that "we see nothing inconsistent, anomalous, or unfair about permitting North Carolina to employ removal in the same manner as any other defendant facing federal claims" and that as a result, "North Carolina, having not already consented to suit in its own courts, did not waive sovereign immunity by voluntarily removing the action to federal court." *Id; see also Bergemann v. Rhode Island Dep't of Env't Mgmt.*, 665 F.3d 336, 341–43 (1st Cir. 2011) (noting that "*Lapides* leaves open the question of whether removal of a federal claim effects a waiver when a state has not waived immunity to that federal claim in its own courts" and holding that Rhode Island had not waived its sovereign immunity to FLSA claims by removing the case to federal court because it was immune to the claims in both courts and the removal created no unfairness) (citing *Stewart* with approval).

      Here, the MTA was immune with respect to Mr. Mattison's Rehabilitation Act claims in state court. By removing the case to federal court, where it has waived immunity for such claims, the MTA did not gain any additional immunity. Pursuant to *Stewart*, the MTA retains its sovereign immunity to Mr. Mattison's Rehabilitation Act claims. Therefore, count one of the second amended complaint will be dismissed as the Court lacks subject matter jurisdiction over those claims.

## II.     The Sufficiency of the Allegations in the Second Amended Complaint

The MTA argues that Mr. Mattison has engaged in "shotgun" pleading, that the prior settlement agreements bar his claims, and that he has failed to sufficiently plead any of his claims. The Court is unable to judge the sufficiency of Mr. Mattison's allegations because he has failed to provide a "a short and plain statement of the claim[s] showing [he] is entitled to relief" by coupling relevant factual allegations with each of his claims that, if true, would entitle him to relief. Fed. R. Civ. P. 8(a)(2).

As stated above, this is the third employment-related case Mr. Mattison has brought against the MTA. He settled the other two and acknowledges that the latest "Settlement Agreement resolved all" prior claims but contends that it "*did not* resolve any claims that had not yet accrued as of February 15, 2022, the date of settlement." ECF No. 32-1 at 11. The Court agrees with this assessment, as far as it goes. Mr. Mattison contends that he "is not making a claim [for] damages arising directly from conduct that was resolved by the Settlement Agreement, or in settlement of the first lawsuit, but rather for conduct that occurred and resultant damage that Plaintiff has sustained since February 15, 2022." *Id.* at 12. Nonetheless, ten of sixteen pages in the fact section of the second amended complaint deal with events that precede the most recent settlement. ECF No. 23 ¶¶ 15–76. Similarly, in his response to the motion to dismiss, three of four pages in the introduction discuss pre-settlement facts, as do three of five pages in the fact section. ECF No. 32-1 at 1–3, 5–9.

While on one hand Mr. Mattison claims he is not relying on pre-settlement facts to support this case, on the other hand he claims that "[s]ince this harassment is a continuing violation, the Court is able to consider any incidents arising from the beginning of Plaintiff's employment," which he contends include "numerous instances

11

of harassment, including false reports, ridicule of his job performance, questioning FMLA absences and bathroom use, and using random drug testing to set Plaintiff up to be fired." *Id.* at 26; *see also id.* at 23 ("Considering Defendant's retaliation began after the initial EEOC Charge in 2012, all conduct displayed by Defendant is causally connected. Simply because Plaintiff enjoyed short periods of being harassment-free in the 14 years of employment at the MTA does not establish that the discriminatory incidents were isolated in nature."). Likewise, Mr. Mattison argues generally that the MTA acted against him in a variety of ways, but it is unclear whether he is relying on pre- or post-settlement allegations to support these claims. *See, e.g.*, *id.* at 21 ("The simple fact is, Defendant has engaged in identical behavior vis-a-vis the treatment he received as alleged in the initial lawsuit in 2015, the second lawsuit and grievance in 2020, and now in this third suit. Defendant, both then and now, created false write-ups, created false allegations of being late or absent, required Plaintiff to fulfill unequal work quotas, and hyper-scrutinized Plaintiff's work. *See generally* SAC. Defendant engaged in behavior that comprises a continuing violation theory of the retaliation, hostile work environment, and disparate treatment of Plaintiff that has persisted for over a decade.").

Typically, hostile work environment claims arise from "a series of separate acts that collectively constitute one 'unlawful employment practice,'" and therefore "such claims are subject to a 'continuing violation' theory." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 221 (4th Cir. 2016) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)). This theory is generally cited in connection with statutes of limitations, allowing acts that on their own would be time-barred to be considered as part of an ongoing hostile environment. *See, e.g.*, *id.* at 221–22. But this case is not that situation. Mr. Mattison acknowledges and cites to the February 15, 2022 settlement

12

agreement that "foreclose[d] all possibility of any future claims based upon acts . . . prior to the date of" the second settlement agreement, and in which he released the MTA "from all claims . . . from the beginning of time to the date of this Settlement Agreement, including . . . any and all claims raised, or which could have been raised" in the second lawsuit or "which relate, in any way, to the matters alleged in the Lawsuit." ECF No. 27-2 ¶¶ U & X. As a result, Mr. Mattison cannot rely on pre-settlement allegations to prove his hostile work environment claims. Other than the allegations that the lawsuits and settlements occurred, the pre-settlement facts in the second amended complaint are largely irrelevant and only serve to confuse the actual issues in the case.

If Mr. Mattison chooses to file a third amended complaint or files a new lawsuit, he must describe what facts occurring after February 15, 2022 support each of his claims, including his hostile work environment, retaliation, and failure to accommodate claims under the MFEPA and his claims of interference and retaliation under the FMLA. Considering only those post-settlement facts, the second amended complaint does not clearly allege, among other things, what adverse actions were allegedly taken against Mr. Mattison in connection with his MFEPA and FMLA claims and how they are causally connected to his protected activities, what FMLA and MFEPA accommodations he sought or were denied, or how the MTA interfered with his FMLA leave.

### III.  Additional Arguments

The MTA raises two other arguments regarding Mr. Mattison's FMLA and MFEPA claims. (The Court need not reach any other issues related to Mr. Mattison's Rehabilitation Act claims because they cannot be reasserted in this lawsuit.)

First, the MTA argues that Mr. Mattison abandoned his FMLA claims because he included them in his first complaint but not in his amended complaint, allegedly

13

abandoning them, and now has attempted to reassert them in his second amended complaint. The MTA does not cite any relevant law supporting this proposition. For example, the MTA cites *Hoefling v. City of Miami*, but as recognized by the MTA, *Hoefling* stands for the proposition that an amended complaint supersedes all former pleadings, which become "legal nulllit[ies]." 811 F.3d 1271, 1277 (11th Cir. 2016). Accordingly, the second amended complaint cannot serve as the basis for waiver of Mr. Mattison's FMLA claims.

    Second, the MTA argues that Mr. Mattison failed to exhaust his MFEPA claims because the allegations that support those claims were not included in his EEOC charge. *See Marshall v. Anne Arundel Cnty., Maryland*, Case No. 18-cv-74-ELH, 2019 WL 568676, at *9–10 (D. Md. Feb. 12, 2019) (holding that "the MFEPA require[s] a plaintiff to exhaust administrative remedies prior to filing suit in court" by filing a charge). Mr. Mattison alleges in his August 30, 2023 EEOC charge that he has "been subjected to harassment," has "been ordered to take random drug and or alcohol tests 3-4-times per month," "was threated to receive an occurrence for using FMLA because of [his] disability, "was questioned how [he] replaced a part that wasn't in stock," and "was held in a room with Administrator Rufeshwaer Bhagwandin, Assistant Administrator Dorothy Peoples, Shop Stewart Jimmy Carter, and [his] supervisor Brian Brooks" where "Mr. Brooks sat in a chair . . . preventing [him] from exiting the room." ECF No. 27-3 at 1. The charge continues that Mr. Mattison believes he has "been retaliated against for engaging in a protected activity because of [his] disability and for filing [an] EEOC Charge." *Id.* at 2. Thus, the charge alleges harassment and retaliation based on engaging in activities protected by the MFEPA and FMLA, and arguably a failure to accommodate

14

his use of FMLA leave, and lists many of the relevant events alleged in the second amended complaint.

Although an "EEOC charge defines the scope of the plaintiff's right to institute a civil suit" it "does not strictly limit" the subsequent lawsuit; "rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002) (quoting *Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 491 (4th Cir. 1981)); s*ee also Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000) ("If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable investigation, the plaintiff may advance such claims in her subsequent civil suit."). Here, it would appear that Mr. Mattison's claims are reasonably related to his charge, but given that the second amended complaint must be dismissed for other reasons, the Court will reserve judgment on this issue.

## CONCLUSION

Mr. Mattison's Rehabilitation Act claims will be dismissed with prejudice because the MTA is immune to the claims since they were first brought in state court. The remainder of the complaint will be dismissed without prejudice because Mr. Mattison has not clearly alleged facts occurring after February 15, 2022 that state a claim for each of his three MFEPA claims and two FMLA claims.

Date:  October 29, 2025

                                                       /s/
                                     Adam B. Abelson
                                     United States District Judge